IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Access All, Inc., a Florida Not-for-Profit
Corporation, and Peter Spalluto, Individually,

    Plaintiffs,

v.

Mercury Huntington Corp., as Trustee of
Colonnade Trust, a Massachusetts Nominee
Trust, under Declaration of Trust Dated October
16, 1969, as amended,

    Defendant.

CIVIL ACTION NO.: 04-12239-RCL

**PLAINTIFFS' RESPONSE TO
DEFENDANT'S MOTION TO DISMISS
WITH INCORPORATED
MEMORANDUM OF LAW**

COME NOW the Plaintiffs, Access 4 All, Inc., a Florida not-for-profit corporation, and Peter Spalluto, individually, by and through their undersigned counsel, and pursuant to the Local Rules of the United States District Court for the District of Massachusetts, hereby file the following Response to Defendant's Motion to Dismiss with Incorporated Memorandum of Law, and state the following:

## MEMORANDUM OF LAW

### I. Background

  1. Corporate Plaintiff, Access 4 All, Inc., is a not-for-profit corporation, chartered in the State of Florida. Its members include persons with a range of disabilities, including, quadriplegia, paraplegia, profound hearing loss and legal blindness. The organization was formed to provide support for its members as well as create a unified voice to make society at large aware of the issues that affect disabled persons, and in particular the lack of access to public accommodations.

  2. Individual Plaintiff, Peter Spalluto, is a disabled person, as defined by the Americans With Disabilities Act of 1990, on account of being a quadriplegic, that requires him to use a wheelchair to ambulate. (See Plaintiffs First Amended Complaint, DE 7, Paragraph 12).

  3. The Defendant's property is a hotel located at 120 Huntington Avenue, Boston, Massachusetts. The Plaintiffs have alleged that the property, including the parking, access to

goods and services, restrooms and guestrooms, are not in compliance with the Americans With
Disabilities Act Guidelines (ADAAG); *See* 28 CFR Part 3 (Revised as of 1/01/94); See Plaintiffs First
Amended Complaint, DE 7, Paragraph 20.

4.  Plaintiff, Spalluto, alleges that in the past three (3) years, he has visited the Boston area
at least once a year.  In the future, Mr. Spalluto alleges that he shall be in the Boston area more
often as not only shall he be going to Boston for personal reasons but for business purposes as
well.  Spalluto alleges that he particularly enjoys the Boston area because of the numerous stores
dedicated to coin collecting, antique book collecting, stores that have collector items, and because
of the great history of the Boston area.  Furthermore, he especially likes the area around the
Prudential Center where the subject hotel is located.

5.  Plaintiff, Spalluto, member of Access 4 All, Inc., has alleged in the First Amended
Complaint (DE 7, Paragraph 12) that he was the guest of the subject hotel in September, 2004, and
that he would have returned to the hotel as a guest on a scheduled visit to Boston in July 2005 had
the facility had accessible accommodations.  He has further alleged that prior to the filing of the
subject lawsuit that he had plans to return to the  Brasserie Jo restaurant at the hotel in July 2005.
Spalluto alleges that he shall stay at the hotel once the hotel has accessible accommodations for
his use.

6.  Plaintiff, Spalluto, has further alleged that he has encountered architectural barriers at
the subject property (See Plaintiffs First Amended Complaint, DE 7, Paragraph 13), and that
barriers to access at the property have effectively denied or diminished the Plaintiffs' ability to visit
the property and have endangered his safety.  Barriers to access involving parking, common area
restrooms and hotel rooms pose a risk of injury to the Plaintiff.  Other barriers to access as
described in the Complaint cause similar risk of injury, embarrassment, or discomfort to the Plaintiff.
(See Plaintiffs First Amended Complaint, DE 7, Paragraph 20).  Plaintiffs have further alleged that
the Defendant's property does not comply with the ADA and the regulations promulgated

thereunder, and that the non-compliance has caused and will cause them to suffer direct and indirect injury (See Plaintiffs First Amended Complaint, DE 7, Paragraph 11). Plaintiffs further allege that they have reasonable grounds to believe that they will continue to be subjected to the discrimination, in violation of the ADA by the Defendant (See Plaintiffs First Amended Complaint, DE 7, Paragraph 15).

7. Defendant has filed a Motion to Dismiss, without designating the section of the Federal Rules upon which it relies, essentially arguing that the Plaintiff's complaint should be dismissed with prejudice because: (a) The Complaint is silent as to the nature of Mr. Spalluto's disability, when he visited the hotel and when he intends to return, and how he was injured by the purported violations; (b) Plaintiff showed a lack of good faith in bringing this action in filing suit prior to giving notice either to the hotel or to the Massachusetts Agency authorized to deal with public accommodation issues. Plaintiffs shall respond to Defendant's foregoing contentions but essentially its position is that the Plaintiff's Complaint satisfied the notice pleading requirements of the Federal Rules of Civil Procedure and stated a cause of action under Title III of the ADA; nevertheless to avoid further argument on the standing issue, Plaintiff has filed an Amended Complaint addressing the issues of Mr. Spalluto's disability and his stay at the hotel, his encounter with architectural barriers and his intent to return to the hotel once the hotel is made accessible, and his definite intent to return to the restaurant in the hotel in July, 2005. Additionally, Plaintiff claims that there is no notice requirement under Title III of the ADA, nor a requirement to exhaust administrative remedies and that Defendant's argument is hypocritical in claiming that the plaintiff lacked good faith when fifteen years have passed since the passage of the Americans with Disabilities Act and the Defendant's facility remains grossly noncompliant with the requirements thereof.

## II. **Standard of Review**

It is well-established law that a Complaint should not be dismissed unless it appears beyond doubt that the Plaintiff can prove no set of facts entitling him to relief. *Connelly v. Gibson*, 355 U.S.

41, 45-46 (1957). All that is required is a "short and plain statement of the claim." Id p. 42. In ruling on a Motion to Dismiss, the Court must view the factual allegations in the Complaint in a light most favorable to the Plaintiff. *Brown v. Crawford County, Ga.*, 960 F.2d 1002, 1010 (11th Cir. 1992). Likewise, dismissal of a party is appropriate where it is clear that the Court has no set of facts that would conclusively support the party's allegations as asserted in the Complaint. *H.J. Inc. v. Northwestern Bell TEL Co.*, 492 U.S. 229, 250 (1989).

Therefore, in a well-pleaded Complaint, the standard for dismissing a party is not whether the Court can determine if a party will prevail on the outcome, but based on factual allegations made, whether a party can sustain the lawsuit through the evidentiary phase. See F.R.C.P. 8(a); *Access 4 All, Inc., v. TKM Global Investment, Inc.*, Case No. 6:02-CIV-1233-orl-Conway, 6-7 (M.D. Fla. Feb. 9, 2003) (denying motion to dismiss individual Plaintiff and organizational Plaintiff, for lack of standing because both met constitutional standards) and citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). On the contrary, a Court should grant a Motion to Dismiss where a Plaintiff has not alleged facts sufficient to establish the elements of a legal issue that would provide relief. See *Marshall County Bd. Of Educ. v. Marshall County Gas. Dist.*, 992 F.2d 1171 (11th Cir. 1993).

When "lack of standing is raised in a Motion to Dismiss, the issue is properly resolved by reference to the allegations of the Complaint." See *Church v. City of Huntsville*, 30 F.3d. 1332, 1333 (11th Cir. 1994). The Complaint's "well pleaded facts" are accepted as true, but its legal conclusions are not. See *Honduras Aircraft Registry, Ltd. vs. Government of Honduras*, 119 F.3rd 1530, 1533 (11th Cir. 1997).

### III. Plaintiff, PETER SPALLUTO, has pled sufficient facts in the Complaint to establish standing

Parties seeking injunctive relief under Title III of the ADA must meet the irreducible, constitutional standing under Article III, Section 2 of the Constitution by showing that (1) they have suffered an injury-in-fact to a legally protected interest that is concrete and particularized and (b)

actual or imminent, not conjectural or hypothetical; that (2) there is casual connection between the injury and the conduct complained of; and, that (3) the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A party must have standing at the time a lawsuit is filed. *Friends of the Earth v. Laidlaw Envtl. Servs.* (TSC), Inc., 528 U. S. 167, 190 through 191 (2000) and *Robidoux v. Celani*, 987 F.2d 931, 938 (2d Cir. 1993).

Clearly, accepting the Plaintiffs allegations as true, as required when considering a Motion to Dismiss (See *Conway, supra*), the Plaintiff, Spalluto, has sufficiently alleged injury in fact that can be redressed by favorable decision[1]. Spalluto has alleged that he was a guest at the subject hotel in September 2004, encountered architectural barriers at the hotel, and that he would have definitely returned to the hotel as a guest in July 2005 had the hotel had accessible accommodations for his use. Furthermore, he alleges that he would stay at the hotel in the future when the hotel has accessible accommodations and shall return to the restaurant in the hotel in July 2005, which has been his plan since eating at the restaurant in September 2004.

Courts have sustained the standing of the Plaintiff to proceed with a claim under Title III of the ADA, and denied a Motion to Dismiss based on lack of standing on much less specific allegations then those contained in Plaintiffs Amended Complaint. *Advocates for the Disabled, Inc. and Martin Marcus, Plaintiffs v. Mariposa Resources Corporation,* Case No. 01-0134-civ-Lenard (S.D. Fla. June 19th, 2001).

In *Mariposa, supra*, the court states on Page 3 and 4 of the Court's Order Denying Defendant's Motion to Dismiss,

> "Next, the court examines whether Plaintiff, Martin Marcus, has standing to sue Defendant in this matter. For an individual Plaintiff to establish standing, the Plaintiff must show:
>      (1) It has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical

---

[1]An alleged violation of the ADA is an injury sufficient to give rise to an Article III case or controversy. See *Parr v. L&L Drive In Restaurant*, 96 F. Supp 2d 1065 (D. Hawaii 2000) p 13.

(2) the injury is fairly traceable to the challenged action of the Defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." White's Place, Inc., 222 F.3d 1329 (quoting Friends of the Earth, Inc., 528 US 167, - 120 S. Ct. 693, 704), (2000). Plaintiff MARCUS alleges in the Complaint that he "has visited the property which forms the basis of the lawsuit and plans to return to the property to avail himself of the goods and services offered to the public at the property." Plaintiff, MARCUS, also alleges that the "architectural barriers" on the property have effectively denied or diminished (his) ability to visit the property and have endangered his safety. Barriers to access involving parking and path of travel at this property have posed a risk of injury to the Plaintiff. Every other barrier to access as described in this Complaint causes similar risk of injury, embarrassment, or discomfort to the Plaintiff." The court finds that these allegations satisfy the requirements to establish Plaintiff, MARCUS' standing in this matter."

Clearly, accepting the Plaintiffs' allegations as true, as required when considering a Motion to Dismiss (See *Conway, supra*), the Plaintiffs have sufficiently alleged an injury in fact that can be redressed by a favorable decision in this case. The case of *Frotton v. Barkin*, 226 F. Supp 2d 92 (D.Mass 2002) cited by the Defendant does not compel a different result, nor does the case stand for the proposition that the Defendant has applied to it. In Frotton, the court was not addressing the sufficiency of the allegations of Plaintiffs complaint; it was determining whether there was sufficient proof offered to support standing to issue a preliminary injunction. Furthermore, the court found in a later proceedings that the Plaintiff had standing to bring their claim. (See Docket Entry 104, Civil Action #2001-12124-RBC.)

Spalluto has suffered an injury in fact when he encountered architectural barriers at the Defendant's Property when such barriers were in violation of the ADA. *See Disabled in Action of Metropolitan New York v. Trump*, 2003 WL 1751785 * 7 (S.D.N.Y. 2003), wherein the court stated:

"Courts considering ADA claims have found that disabled plaintiffs who encounter barriers at restaurants, stores, hotels or stadiums prior to filing their complaints have standing to bring claims for injunctive relief if they show a plausible intention or desire to return to the place but for the barriers to access." See *Pickern v. Holiday Quality Foods Inc.* 293 F.3d 1133, 1138 (9th Cir. 2002) (Plaintiff had standing who encountered barriers at a grocery store and who stated he would shop there again if it where accessible); *Steger v. Franco*, 228 F.3d 889 (8th Cir. 2000) (to

demonstrate standing plaintiffs must "at least prove knowledge of the barriers and that they would visit the building in the imminent future but for those barriers"); see also *D'Lil v. Stardust Vacation Club*, No. CIV-S-00-1496, 2001 WL 1825832, at *4 (E.D. Cal. Dec 21, 2001) (plaintiff had standing who alleged that she "would, could and will return to the [hotel]...when it is made accessible to persons with disabilities," she had a history of travel to the area, and she had particular reasons for seeking accommodation at the hotel); *Access Now, Inc. v. South Florida Stadium Corp.*, 161 F.Supp.2d 1357, 1364 (S.D.Fla. 2001) (plaintiff who testified that he would return to stadium, particularly if the alleged barriers were removed, had standing); *Access 123 v. Markey's Lobster Pool, Inc.*, No. CIV. 00-382-JD, 2001 WL 920051 at *3 (D.N.H. Aug. 8, 2001) (plaintiff had standing when he was aware of barriers in accessing restaurant from parking lot, barriers had not been removed when complaint was filed, and he stated he would return to [the restaurant] if the barriers were removed"); *Association for Disabled Americans v. Claypool Holdings*, No. IP00-0344-C-T/G, 2001 WL 1112109, at *20 (S.D.Ind. Aug. 6, 2001) (plaintiff had standing who "expressed a desire to stay overnight at the Embassy Suites on future visits to Indianapolis if the hotel were ADA compliant" and who presented evidence that he traveled to Indianapolis at least once a year); *Dudley v. Hannaford Bros. Co.*, 146 F.Supp.2d 82, 86 (D.Me.2001) (plaintiff had standing who alleged that Shop'n Save refused to sell him alcohol based on his disability and had not altered its policies, and who alleged that he often visited Shop'n Save stores and would like to purchase alcohol but had not attempted to do so based on his past experience); *Parr v. L & L Drive-Inn Restaurant*, 96 F.Supp.2d 1065, 1080 (D.Haw.2000) (holding after bench trial that plaintiff had standing to bring claim against fast-food restaurant in part because the court was "satisfied that Plaintiff's intent to return [was] sincere"); *Colorado Cross Disability Coalition v. Hermanson Family Ltd. Partnership I*, No. Civ.A. 86-WY-2490-AJ, et al., 1997 WL 33471623, at *6 (D.Colo. Aug. 5, 1997) (plaintiff has standing if he shows that "discrimination on the basis of disability has deprived him of the ability to gain access to the public accommodations and that a failure to redress the injury will continue to deprive him of access to those facilities in the future")."

Spalluto has sufficiently alleged a plausible intent to return to the subject hotel, in that he goes to the Boston area a minimum of once a year, and in the future will be going more often for both personal and business reasons, and that he particularly likes the area where the subject hotel is located around the Prudential Center.

In *Assoc. for Disabled Americans Inc. and Michael H. Brennan v. Claypool Holdings, LLC*, 2001 WL 1112109 (S.D.Ind. 2001), the District Court, in granting standing to the Plaintiff, a Miami resident and the ADA expert in the case, who "expressed a desire to stay overnight at the Embassy

Suites on future visits to Indianapolis if the hotel were ADA compliant", and who presented evidence

that he traveled to Indianapolis from Miami at least once a year, explained that standing should be

liberally construed taking into consideration the congressional intent in passing the ADA.

> "Moreover, the ADA was intended to "provide a clear and comprehensive
> national mandate for the elimination of discrimination against individuals
> with disabilities," 42 U.S.C., §12101(b))1), and is a remedial statute, see
> *Steger*, 228 F. 3d at 894, *Rehling V.C. of Chicago*, 207 F. 3d 1009,
> 1016(7th Cir. 2000), as amended (April 4, 2000), which "should be
> broadly construed to effectuate its purposes." *Tcherepnin v. Knight*, 389
> U.S. 332, 336(1967); see *Steger*, 228 F. 3d at 894. In light of the
> evidence of record and the purpose of the ADA, and in construing the
> statute broadly to effectuate its purposes, the court finds that Plaintiff
> have demonstrated Mr. Brennen's standing to sue under Title III of the
> ADA." (Section 21, Page 17)

As stated by Professor Adam A. Milani, Associate Professor, Mercer University School of

Law, Wake Forest Law Review, volume 39, April 5, 2004, Page 90, in his article entitled, Wheelchair

Users Who Lack "Standing" Another Procedural Threshold Blocking Enforcement of Title II and III

of the ADA,

> "Several Courts have held that, even when there has been only a single
> past instance of discrimination, plaintiffs have shown the requisite
> standing to sue to remedy accessibility problems. These Courts have
> found that, if the barriers continue to exist, the plaintiffs have shown
> either a sufficient evidence of imminent future injury and/or actual or
> present injury because they are deterred from using the facility.
>     For example, in *Pickern v. Holiday Quality Foods Incorporated*,
> 293 F. 3d 1133 (9th Cir 2002), the Court found that ongoing accessibility
> problems at a store were sufficient to show both an imminent future injury
> and an actual and present injury. One of the four named plaintiffs in
> *Pickern*, Jerry Doran, was a paraplegic who used a wheelchair. He sued
> Holiday Quality Foods, Inc. ("Holiday") seeking the removal of
> architectural barriers that made it difficult for him to access one of its
> grocery stores. Doran had gone to the store twice. On the second visit,
> in late 1998, he waited in the parking lot while a companion went in to the
> store because of his prior experience with inadequate access to and from
> the parking lot, to the check stand, to the restroom, and to vending
> machines. Doran filed his complaint on March 1, 1999, and the district
> court held he did not have standing and his claim was time-barred
> because he had waited for over a year after he first discovered the
> store's barriers before filing the complaint.
>     The Ninth Circuit reversed. On the timeliness issue, the court
> noted that the ADA provides for injunctive relief to "any person who

*is being subjected to* discrimination on the basis of disability' or who has 'reasonable grounds for believing that such person *is about to be subjected to* discrimination'" It said that the phrases, "is being subjected to" and "is about to be subjected to" showed that continuing or threatened violations of the statute were injuries for which a plaintiff could seek injunctive relief under the ADA. It also noted that the ADA does not require "a person with a disability to engage in a *futile gesture* if such person has actual notice that a person or organization...does not intend to comply" with the statute. Under this language, the court held that a plaintiff has suffered an injury when he is aware of accessibility problems at a public accommodation and is obstructed from visiting that accommodation. Because Doran was currently aware of barriers to access at a Holiday store and those barriers deterred him from entering the store shortly before he filed suit, the court held his suit for injunctive relief was not time-barred."

Furthermore, in *Steger v. Franco Inc.,* 228 F.3d 889, 892 (8th Cir. 2000), a blind plaintiff who visited the public accommodation only once had standing to seek injunctive relief to obtain ADA compliance with the entire building based on his inability to find the restroom due to lack of signage and because he frequently visited governmental offices and private businesses in the area as a sales and marketing representative. The court finding that the ADA plaintiff "need not engage in the 'futile gesture' of visiting a building containing known barriers that the owner has no intention of remedying" but "must at least prove knowledge of the barriers and that they would visit the building in the imminent future but for those barriers"

In *Dudley v. Hannaford Bros. Co.,* 333 F.3d 299 (1CA 2003), a person with a brain injury that gave him the outward appearance of being intoxicated challenged a store policy of never reconsidering a cashier's initial decision to refuse to sell alcohol to a customer, who had been to the store only once. Defendant argued that "a single incident of discrimination is insufficient to support a private right of action under Title III of the ADA". This argument did not challenge the district court's conclusion that Dudley had standing to pursue a Title III claim, but instead "attacked the court's closely related determination that the language of Section 12188(a)(1) is broad enough to provide a private right of action for an individual who suffered a single act of discrimination. "As Professor Milani points out in his law review article, supra Page 100, "The First Circuit rejected this

argument, while it agreed that ADA Title III does not allow claims based on past discrimination that is unlikely to reoccur and therefore requires some ongoing harm, it disagreed with Hannaford's interpretation of the statutes "futile gesture" exception.  Specifically, Hannaford "assert(ed) that Dudley, in order to establish an ongoing harm, must prove that a subsequent effort on his part to purchase alcohol beverages at the ... store would have been 'a futile gesture'".

The court stated:

> The proposition that Hannaford advances, the disabled person must subject himself to repeated instances of discrimination in order to invoke the remedial framework of Title III of the ADA - terns the language of § 12188 (a)(1) on its head."  The futile gesture provision is designed to protect the disabled plaintiff from having to shoulder an undue evidentiary burden.

The court in *Trump, supra* on Page 8, distinguishes cases where a person desires to use a public accommodation, to those involving uncertain events such as being arrested or going to the hospital emergency room.

> "[T]he present case differs also from *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), where the Court held that a plaintiff who had been subjected to a choke hold by the Los Angeles police lacked standing to seek an injunction against the enforcement of a police choke hold policy.  The Court said that "Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the choke holds by police officers," *id.* at 105, and the Court found that there was not a sufficient likelihood of future injury to support standing, *id.*  The Court stated that "'[p]ast exposure to illegal conduct does not itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.'" *Id.* at 102 (quoting *O'Shea v. Littleton,* 414 U.S. 488, 495-96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).  However, the present case, as in *Laidlaw,* the alleged violation had the ongoing adverse effect of deterring the plaintiffs from visiting a place they would otherwise like to go."
>
> "Defendant relies on several cases where courts have considered suits by deaf plaintiffs against hospitals for failure to provide sign language interpreters in emergency rooms and found that they plaintiffs lacked standing to bring claims under Title III of the ADA because there was not sufficient likelihood that they would return to the hospital for emergency care and face the same problem again. See *Constance v. State Univ. of N.Y. Health Sci. Ctr.*, 166 F.Supp.2d 663, 667 (N.D.N.Y.2001); *Freydel v. N.Y. Hosp.*, No. 97 Civ. 7926, 2000 WL 10264, at *3 (S.D.N.Y. Jan.4,

2000); *Naiman v. N.Y Univ.*, No. 97 Civ. 6469, 1997 WL 249970, at *5 (S.D.N.Y. May 13, 1997); *Proctor v. Prince George's Hosp. Ctr.*, 32 F.Supp.2d 830, 833 (D.Md.1998); *Schroedel v. N.Y. Univ., Med.*, F.Supp 594. 599 (S.D.N.Y. 1995). Those cases are more closely analogous to *Lyons* than the present case. A person generally does not desire or intend to receive emergency room treatment, just as Lyons did not desire or intend to be arrested. In the present case, if Levine's and Zames' statement are credited, the alleged ADA violation injures them by deterring them from going to a place they would like to visit. Deaf persons could be injured again by emergency room personnel only if they had to return to the hospital for emergency treatment – an uncertain event. Likewise, Lyons could be injured again by the police only if he was arrested again, also an uncertain event. In those cases, unlike in the present case there is not plausible ongoing injury."

Plaintiff is not limited in ADA Title III case to obtaining relief only for those barriers that plaintiff initially encounter, but includes the right to obtain injunctive relief with all related barriers within the subject accommodation relating to plaintiffs disability. See *Steger v. Franco*, 228 F.3d 889 (8th Cir. 2000), *Parr v. L & L Drive-Inn Restaurant*, 96 F.Supp.2d 1065, 1080 (D.Haw. 2000) *Association for Disabled Americans Inc., et al v 7-11, Inc.*, Case No. 01-cv-230 (N.D. Tex. 2001), *Independent Living Resources and Pike v. Oregon Arena Corporation* 982 F.Supp. 698 (USDC.Oregon 1997).

As the *Steger* Court states on Page 5,

> "Burch need not encounter all those areas to obtain effective relief (See *e.g. Independent Living Resources*, supra) (ordering injunctive relief for entire arena although it "is unlikely that any individual plaintiff will sit in each of the seats in the arena or use each of the restrooms or attempt to reach each of the dispensers") The effect of such a rule would be piecemeal compliance. To compel a buildings ADA compliance, numerous blind plaintiffs, each injured by a different barrier, would have to seek injunctive relief as to the particular barrier encountered, until all barriers had to be removed. This not only would be inefficient, but impractical. Moreover, the ADA does not suggest such a narrow construction. The statute provides that where a defendant fails to remove a barrier in existing facilities and removal is "readily achievable", 42 USC, Section 12182 (b)(2)(a)(iv) injunctive relief is mandated to "make such facilities readily accessible to and useable by individuals with disabilities ..." 42 USC 12188 (a)(2)

**IV. Plaintiff, Access for All, Inc., has pled sufficient facts to establish standing.**

The Defendant argues that Access 4 All, Inc., the non profit advocacy group, which plaintiff Spalluto is a member lacks standing to bring the subject claim because Spalluto lacks standing and because the group has failed to show direct injury.

As to the issue concerning  Spalluto's standing, that issue has been dealt with herein. Insofar as the standing of the group, Plaintiff, Access 4 All relies solely on its right to bring this claim based on associational standing in accordance with the law of association standing as announced in the case of *Hunt v. Washington State Apple Adver. Comm'n,* 433 US 433, 343 (1977)

In Hunt, the Court held that: "An organization seeking injunctive relief for enforcement of protective legislation has standing if (1) its members or otherwise have standing to sue in their own right; (2) the interest it seeks to enforce is germane to the organizations purpose; (3) is the claim asserted nor the relief requested requires the participation of the individual members of the lawsuit."

The United States Supreme Court also held that only the first two prongs of the Hunt test are constitutional requirements and that the third requirement that neither the claim asserted nor the relief requested requires participation of individual members (of the Association) in the lawsuit is prudential as a matter of "administrative convenience and efficiency" and therefore distinct from the case and controversy requirement of Article III._*United Food & Commercial Workers Local 751 v. Brown Group, Inc.*, 517 U.S. 544 (1996).

In *Hunt*, the Court explained that to have standing, "the association must allege that its members, or any one of them, are suffering immediate or threaten injury as a result of the challenged action of the sort that would make a justiciable case had the members themselves brought suit." *Hunt*,  432 US at 342.  The Court further reasoned that if in a proper case the association seeks a declaration, injunction or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." Id at 343. "The organization provides the means by which (the organizational members) express their collective views and protect their collective interests." Id at

345. Therefore, an organization has standing when its members sustained a "direct and sufficient" injury, the organization is devoted to representing its members interest, and the members are not needed individually for just adjudication. Id at 373-344.

In the subject case, Plaintiffs' seek prospective relief and the rule in *Hunt*, is therefore applicable. Plaintiffs seek relief from the Defendant in the form of modifications to the Defendants property. No award of damages is sought. The first two prongs of the *Hunt* test are met. The Plaintiff, Spalluto has standing to sue on his own behalf; he suffered an injury in fact when he encountered architectural barriers on the Defendants premise. Further, Spalluto has expressed his intent to return to the subject property for personal and business reasons once the property is accessible, and to dine at the facility in July 2005. Clearly, the interest Access seeks to enforce is germane to the organizational purpose. Plaintiff, Access has alleged that the purpose of the organization is to represent the interest of its members by assuring that places of public accommodations are accessible to and useable by the disabled and that it's members are not discriminated against because of their disabilities (See Plaintiffs First Amended Complaint DE 7, Paragraph 11).

As to the third prong of the Hunt test, the prudential considerations in allowing Access, to remain a part of this suit, Access is a membership organization seeking to further the interests and objective of its members in preventing and remedying discrimination on the basis of disability. The doctrine of associational standing recognizes that the principal reason people join an organization is often to create an effective vehicle for vindicating interest that they share with others. *See International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock*, 477 US 274 (1986).There can, indeed be strength in numbers, and many together can often do what one alone cannot. Furthermore, as stated by the United States Supreme Court in *Warth vs Seldin*, 422 US 490, 498 (1975), "if in a proper case the association seeks a declaration, injunction or some other form of prospective relief, you can reasonably suppose that the remedy,

if granted, will inure to the benefit of the association members actually injured". The barriers that allegedly impeded Plaintiff Spalluto's access effect all persons with similar disabilities and Access seeks to further the organizational objective by joining its members to Spalluto's challenge to the alleged barriers.

In *American Disability Association, Inc. v. DI-MI Investment Corp.,* Case No. 01-6300-CIV-Dimitrouleas (SD Florida 2001), the Court explained its basis for recognizing organizational standing in a Title III ADA case.

> "The court concludes that the Plaintiff meets the test for associational standing. First, the Plaintiff's members and officers with disabilities, including, Raymond Cessna, do otherwise have standing to sue the Defendant in their own right. Second, Plaintiffs interest and attempt to ensure that the Shopping Center is accessible to those individuals with disabilities and remedy these injuries is <u>central</u>, to the Plaintiff's purpose, "to represent its members", interest by assuring that places of public accommodation are accessible, to, and usable by, the disabled, and that its members and other handicapped persons are not discriminated against because of their disabilities. Finally, neither the claim asserted, the violations of the ADA, nor the relief requested (permanent injunction requiring the Defendant to make the facilities at the Shopping Center readily accessible to and usable by individuals with disabilities, to the extent required by the ADA), requires the participation of individual members in the lawsuit. No individual assessment of Plaintiff's members must be made to determine what measures the Defendant must take in order to comply with the ADA. The claim asserted and relief requested can be properly resolved in a group context. See *Hunt*, 432 US at 344, 97 S. Ct. at 2442. Thus, all three (3) prongs of the *Hunt* test are satisfied."[2]

Although Plaintiffs recognize that there is a body of case law holding that a Plaintiff is limited to seeking relief for those disabilities that effect him or her, some courts have held the disability association should have standing to bring suit on behalf of the disability of all its members, once

---

[2]For other cases, recognizing the standing of a disability organization in a Title III ADA claim, see Disabled Patriots of America, Inc. v. Lane Toledo, Order Denying Motion to Dismiss in part Case No. 3:04cv7137 (W.Div. Ohio 2004), Access for the Disabled, Inc. v. Publix Supermarket, Order Denying Motion for Summary Judgment, Case No. 01-6738-civ-Hooeler (S.D. Fla. 2003); Access for the Disabled v. Caplan, Order Denying Summary Judgment, Case No. 01-7310-civ-Jordon (S.D. Fla. 2002)

one or more of its members has standing to pursue the claim.  *Access 4 All, Inc. v TKM Global Investment, Inc.,* Case No. 6.02-CIV-1233-ORC-Conway, MD Fla.. (2003), *Independent Living Resources supra*  Plaintiff's argue that this rational is correct, as the ADA does not require that a Defendant redesign its facilities to fit the specific needs of an individual plaintiff, but rather and most prudentially, the public accommodation remove the barriers and install the architectural designs that are established by the ADA and Code of Federal Regulations.  See 42 USC 12181 et seq., 28 C.F.R., Part 36, 42USCA § 12188(a)(2) provides

> "in the case of violations of § 12182(b)(2) (A)(IV), and § 12183(a), of this title, injunctive relief shall include an order to alter facilities to make such facilities readily accessible too and usable by individuals with disabilities to the extent required by this subchapter.

 In fact, a leading expert in universal design and the ADA guidelines, James Evan Terry, recently stated that "design standards like those adopted under the ADA are minimum standards... The ADA does not mandate a gradual slope to an entrance used by all.  An ADA-compliant ramp can be so long and steep that over two-thirds of people in wheelchairs cannot use it."  James Evan Terry, *Preface, Universal Design and the New ADA/ABA Guidelines*, Harvard Design School Office of Executive Education, August 4-6, 2003 (See copy attached as Exhibit A).

It stands to reason that ADA compliance means "total" compliance that would benefit a group of disabled person and not one particular individual.

## V. Pre-Suit Notice Is Not Required

The Defendants and their attorneys have literally attacked the Plaintiffs and their attorneys for not providing pre-suit notice to the Defendant.

First, there is no pre-suit notification requirement in Title III of the ADA.  Efforts by Congressman Mark Foley, of West Palm Beach, Florida to enact such pre-suit notice of 90 days, as a condition to commencing a civil action with respect to a place of public accommodation or commercial facility, known as the ADA Notification Act have never got out of the congressional

committee's, where the bill was introduced in the 106th and 107th Congress.

Second, the ADA was passed in 1990, almost 15 years ago, to provide individuals with disability "civil rights protections with respect to discrimination that are parallel to those provided to individuals on the basis of race, color, national origin, sex and religion." *Parr supra*, Page 5., and "Congress delayed the effective date of Title III of the ADA for 18 months to permit adequate time for businesses to become acquainted with the ADA's requirements and take the necessary steps to achieve compliance." Parr Page 6.,

There are compelling reasons why any notice would be contrary to the efforts to enforce the ADA. Some of these arguments are as follows:

a)  People are presumed to know the law, such that a general principal of American Jurisprudence is that ignorance of the law is not an excuse for non-compliance, which is especially true here when dealing with a civil rights law that was enacted over 15 years ago;

b.  Imposing a notice requirement would eliminate whatever minimum incentive that exists to comply with Title III of the ADA, and would allow a violator to continue to discriminate with impunity until such violator receives actual notice. The Plaintiffs should not be required to wait and return to a facility in order to seek relief to end discrimination.

c.  Providing meaningful notice to the Defendant, requires the Plaintiff to have an expert to identify precise ADA violations, and most likely an attorney to investigate information concerning the Defendant's legal status and the appropriate party to whom to provide notice, all of which is a costly process that should be paid by the violator, and not the victim;

d.  Proving complete and meaningful notice to a Defendant of all the potential violations requires full access to the Defendant's property, which generally is unavailable until a formal inspection occurs subsequent to the filing of a lawsuit, pursuant to Rule 34 of the Federal Rules of Civil Procedure.  Such information is not available prior to filing suit.

e.  There are generally no effective mechanisms to provide notice for an architectural barrier after the Defendant's non-compliance for 15 years. In  many cases, to remedy an architectural violation, takes a substantial period of time, perhaps a year or more. Plaintiffs cannot be expected to take the responsibility to monitor the Defendant's efforts to comply. As such, notice itself is generally a futile act unless there is a statutory scheme that provides a definite time for the completion of the improvements, a method of providing Plaintiff and their representatives full access to the Defendant's property, and payment to the Plaintiffs and their representatives to confirm that ADA improvements are completed and that provides severe penalties for non-compliance.

As stated in *Trump supra*, no pre-suit notice or requirements to exhaust administrative remedies are applicable.

> "In *Hunt v. Meharry Medical College,* No. 98 Civ. 7193, 2000 WL 739551,
> at * 5 (S.N.D.Y. June 8, 2000), this court held that a plaintiff was not

required to notify state or local authorities before filing his Title III claim in federal court. Under 42 U.S.C. § 12188(a)(1), Title III's "remedies and procedures" are "the remedies and procedures set forth in [42 U.S.C.]section 2000a- 3(a)," and although § 2000a-3(c) requires prior notice, § 2000a-3(a) does not. *Compare* 42 U.S.C. § 2000a-3(c) (describing notice requirement) *with* 42 U.S.C. § 2000a-d(a) (not mentioning a notice requirement). Although several district courts have stated that notice is required, see *Daigle v. Friendly Ice Cream Corp.,* 957 F.Supp. 8, 9 (D.N.H.1997); *Howard v. Cherry Hill Cutters, Inc.,* 935 F.Supp. 1148, 1050 (D.Colo.1996), the only Circuit that has considered the issue reached the opposite conclusion, see *Botosan v. Paul McNally Realty,* 216 F.3d 827, 832 (9th Cir.2000) ("the plain language of § 12188(a)(1) is clear and unambiguous, and it can be understood without reference to any other statutory provision. Section 12188(a)(1) is devoid of any reference to § 2000a-3(c). Yet, Congress explicitly incorporated subsection (a) of § 2000a-3 into § 12188(a)(1). The incorporation of one statutory provision to the exclusion of another must be presumed intentional under the statutory canon of *expressio unius.")* Other district courts in this Circuit have concluded that no notice is required before bringing a Title III ADA claim. See *Stan v. Wal-Mart Stores, Inc.,* 111 F.Supp.2d 119, 123 (N.D.N.Y.2000); *Mirando v. Villa Roma Resorts, Inc.,* No. 99 Civ. 0162, 1999 WL 1051118, at *1 (S.D.N.Y. Nov. 19, 1999). Plaintiffs were not required to notify state or local authorities prior to filing this suit.

Furthermore, the United States Department of Justice affirms the position that there is no requirement in Title III of the ADA to invoke State administrative remedies prior to bringing suit in Federal Court. As set forth in the Amicus Curiae brief of the Department of Justice in *Ozga v Hertzog*, DMD, Case #95-1964, in an appeal before the United States Court of Appeals for the 3rd Cir., a copy attached hereto as Exhibit B, on Page 2, "Neither the regulations or the Technical Assistance Manual make any mention of the pre-suit state administrative notice requirement that the District Court found applicable here. See 28 C.F.R. 36.501 (a)(1993); Department of Justice, Title III of the Americans with Disabilities Technical Assistance Manual § III 3-8.1000, 8.2000. The absence of any mention of such a request in the contemporaneous administrative interpretation of the statute is cogent evidence of the Attorney General's belief that resort to such procedures was not intended by Congress." (Page 2) Furthermore, the brief sets forth on Page 3, "the District Court dismissed Ozga's complaint of disability based refusal to provide dental services because she failed

-17-

to allege that she exhausted state administrative remedies. That decision is incorrect primarily because the plain language of the statute does not require it."

As to the Defendants argument that the Plaintiff should have first sought relief from the Mass. Access Board, the simple response is that exhaustion of administrative remedies is not required by Title III of the ADA. Furthermore, the requirements of Title III of the ADA, a civil rights statute are not co-extensive with the requirements of the Mass. Architectural Access Board, which establishes a building code, as set forth at 521 CMR, a copy of which is attached hereto as Exhibit L. For example, as set forth in § 3.1 (scope) the Boards authority is limited to "all work performed on public buildings or facilities, including construction, reconstruction, alterations, remodeling, additions, and change of use shall conform to 521 CMR. As such, the Mass. Access Board has no authority over issues such as removal of barriers in existing facilities as set forth in Title III of the ADA at 42 USC § 12182(b)(2)(iv), and 28 CFR 36.304, nor are the requirements concerning alterations to a building similar. For example, the Mass. Access Board regulations in § 3.3.1, provide that, "if the work performed amounts to less than 30% of the full and fair value of the building and (a) if the work cost less than A$100,000, then only the work performed is required to comply with 521 CMR. However, in 3.3.1 if the work cost $100,000 or more, then the work performed is required to comply with 521 CMR . In addition, an accessible public entrance and an accessible toilet room, telephone, drinking fountain (if toilets, telephones and drinking fountains are provided) shall also be provided in compliance with 521 CMR." In contrast, under the ADA, under 28 CFR § 36.402, and  § 36.403, there is no minimum expenditure that alleviates the public accommodations obligation to perform alterations to assure that, to the maximum extent feasible, the path of travel to the altered area and restrooms, telephones and drinking fountains serving the altered area, are readily accessible to and useable by individuals with disabilities, including individuals who use wheelchairs, unless the cost and scope of such alterations is disproportionate to the cost of the overall alteration. In 28 CFR § 36.403 (f) alterations made to provide an

accessible path of travel to an altered area will be deemed disproportionate to the overall alteration when the cost exceeds 20% of the cost of the alteration to the primary function area. Furthermore, the Board seemingly has no authority to award to the Plaintiffs attorney fees and litigation expenses and costs, as authorized by the ADA.

Wherefore, for all the foregoing reasons, the Defendants Motion to Dismiss should be denied.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by U. S. Mail on this 21 day of January, 2005 to: Sheila O'Leary, Foley Hoag LLP., Seaport World Trade Center West, 155 Seaport Blvd., Boston, MA 02210-2600 and Barbara S. Hamelburg, Foley Hoag LLP., Seaport World Trade Center West, 1155 Seaport Blvd., Boston, MA 02210-2600

Respectfully submitted,

O. Oliver Wragg, Esquire     (BBO#: 643152)
  *of Counsel*
John P. Fuller, Esquire     Fla. Bar No.: 0276847
FULLER, FULLER AND ASSOCIATES, P.A.
12000 Biscayne Blvd., Suite 609
North Miami, Florida 33181
Tel: (305) 891-5199
Fax: (305) 893-9505

3631 / m- p'S RESPONSE TO MOTION TO DISMISS.wpd

# EXHIBIT A

# BEAUTIFUL UNIVERSAL DESIGN

## A VISUAL GUIDE

Cynthia A. Leibrock

James Evan Terry



John Wiley and Sons, Inc.

New York   Chichester   Weinheim   Brisbane   Singapore   Toronto

**EXHIBIT**

A

*Cover illustration:* Kohler Universal Bathroom, Kohler Design Center, Kohler, Wisconsin; Designed by Cynthia Leibrock, EASY ACCESS, Fort Collins, Colorado, and Mary Beth Rampolla, Architect and Senior Project Designer, Eva Maddox Associates, Inc.

This book is printed on acid-free paper. ♾

Copyright © 1999 by Cynthia Leibrock and James Evan Terry.
All rights reserved.

Published by John Wiley & Sons, Inc.
Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning or otherwise, except as permitted under Sections 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax (978) 750-4744. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 605 Third Avenue, New York, NY 10158-0012, (212) 850-6011, fax (212) 850-6008, E-Mail: PERMREQ@WILEY.COM.

**Library of Congress Cataloging-in-Publication Data**

Leibrock, Cynthia.
   Beautiful universal design : a visual guide / Cynthia Leibrock. —
2nd ed.
      p.   cm.
   Rev. ed. of : Beautiful barrier-free. c1993
   Includes bibliographical references and index.
   ISBN 0-471-29306-7 (cloth : alk. paper)
   1. Architecture and the handicapped—United States.   I. Leibrock,
Cynthia. Beautiful barrier-free. II. Title.
   NA2545. A1L45   1998
   720'.87—dc21                                         98-36453

Printed in the United States of America.

10 9 8 7 6 5 4 3 2 1

# PREFACE

*Make level paths for your feet, so that the lame will
not be disabled, but rather healed.*

Heb. 12:12–13 NIV

Universal design implies "it could happen to me."[1]
Special needs are for someone else, someone
who needs an exception. Universal design is not a
specialized design niche accommodating a spe-
cial user group. It is simply good design, and good
design provides maximum opportunity and choice
for all users throughout their lives.

Universal design is an ideal that never com-
pletely accommodates diversity but moves in that
direction. The accommodation is simple and invis-
ible, never segregating by ability or economic
means. Universal design is expansive, integrating
users into larger groups, opening markets to more
consumers, and exceeding code to eliminate dis-
ability by design.

## Simplicity

Elaine Ostroff describes universal design as intu-
itive, simple to use, easy to understand, and toler-
ant of error.[2] The strict parameters of a universal
design may actually inspire simplicity and purity of
form. As a minimalist approach, it focuses attention
on the user rather than on the equipment or facility.

Universal design requires minimal physical and
mental effort by the user. An adaptable, adjustable,
or flexible design may not be universal if it requires
complicated changes or high physical effort. A
movable ramp placed over stairs is an adaptation;
it is not a universal solution. Modification is needed
before each use, requiring strength and mobility to
put the ramp in place.

In an effort to meet differences in user needs,
complicated modifications are frequently made to
existing products. In many cases these modifica-
tions only serve to make the products more difficult

to use. Rather than empowering the user by saving
time and energy, these technological dreams
become maintenance nightmares, consuming
time that could be spent in more creative pursuits.
These contraptions frequently intimidate rather
than support, reinforcing a feeling of inadequacy.
In the process, they become visual advertise-
ments of disability and age.

## Invisibility

Universal design is silent and invisible. Although it
must be accessible and barrier free, it must go fur-
ther to quietly meet the needs of all users. A silent
and invisible design isn't labeled by complicated
signage or advertised as "for the elderly and dis-
abled." It is not a design prescription for a specific
disease but a panacea that "heals" many diseases
and accommodates many users without singling
out anyone.

## Maximum,
## Not Minimum Design

Universal design is not a new term for code com-
pliance. Polly Welch maintains that universal
design is an alternative to the prevailing paradigms
of minimum standards and exceptions to the
norm. She goes on to suggest that designers have
historically tended to interpret minimum standards
as maximums, particularly when solutions beyond
the minimum might result in higher cost.[3]

Design standards like those adopted under the
Americans with Disabilities Act (ADA) are mini-
mum standards. They are a good start, but they
still separate us into special user groups, placing
people with disabilities in one toilet stall and the
rest in another, people in wheelchairs on the ramp
while others quickly use the stairs. The ADA does

not mandate a gradual slope to an entrance used by all. An ADA-compliant ramp can be so long and steep that over two thirds of people in wheelchairs cannot use it.[4]

Within the next 20 years, most boomers will personally experience the need for accessibility. They will be appalled at these minimum standards, as appalled as we are today by the following piece of legislation:

No person who is diseased, maimed, mutilated, or in any way deformed as to be a disgusting or unsightly object or an improper person is to be allowed in or on the public ways of this city or shall expose himself to view under penalty of not less than $1 nor more than $50 for each offense.

Known as "the ugly law," this municipal ordinance existed in some cities in the United States as late as 1973. At one point in our history, this was the norm, much as code is the norm today. Universal design does more than is expected by the norm, surpassing the minimum to truly meet human needs.

## Integration

Universal design does not segregate. It encourages the participation of many users, many abilities. It can bring us together as we address our differences. Redundant solutions, like a turnstile for one group and a gate for another, take a separate-but-equal approach. Well-meaning designers often create barrier-free oddities, visually segregating people with abilities varying from the norm. Too many older people struggle up stairways rather than make a spectacle of themselves by using the open lift installed to meet their needs. Too many ramps are attached as makeshift accommodations to meet code, destroying the appearance of a building while attracting unwanted attention to users. Too many cumbersome aids become institutional clichés, and too many people are isolated by their use.

## Elimination of Disability

We all have physical and mental differences, but 40 percent of Americans with disabilities seldom leave their homes because of architectural barriers, primarily doors and rest rooms.[5] Many of us have difficulty living independently and are handicapped by problems created not by ability or age but by obstacles in buildings. The decisions of designers and architects can either disable us or offer us a different way of using the space, a way that provides freedom without the "for handicapped people only" stigma.

Universal design solutions transcend ability with innovation. The technology is in place, there is an enormous need, and with a little imagination designers and architects can literally free us from handicaps by design, providing a world without barriers.

## Affordability

If universal design is to offer a choice to all users, it must be affordable. Accessibility may add as little as 1 percent to the total project cost of new construction.[6] These low costs are expected in commercial facilities when accessibility is considered during the initial design. Affordability and accessibility need not be mutually exclusive.

For the purposes of the Internal Revenue Service (IRS), many accessible products and designs are legitimate medical expenses that can be deducted if they exceed 7½ percent of an individual's adjusted gross income.[7] Examples include grab bars, widened doorways, and ramps. Businesses may deduct up to $15,000 per year for cost associated with the removal of qualified architectural barriers. Small businesses may be eligible for an annual $5,000 tax credit to comply with ADA requirements. The tax credit may also be used for consulting fees incurred in removing architectural barriers.[8] On the other hand, the cost of not complying with ADA may be lost customers, missed sales, poor service, complaints, or even lawsuits.

Some universal design expenses are reimbursable through public and private insurance programs. In addition, some states offer aid and low-interest loans through community development block grants and similar programs. The

# EXHIBIT B

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 95-1964

ELEANOR OZGA,

Plaintiff-Appellant

v.

CHARLES F. HERTZOG, D.M.D. and
MODERN DENTAL CONCEPTS, INC.,

Defendants-Appellees

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE

STATEMENT OF JURISDICTION

The district court had jurisdiction over this action
pursuant to 42 U.S.C. 12188, 42 U.S.C. 2000a-3(a), and 42 U.S.C.
2000a-6(a). The district court entered a final judgment
dismissing Ozga's complaint on October 13, 1995. The
jurisdiction of this Court is based upon 28 U.S.C. 1291.

STATEMENT OF THE ISSUE

Whether the enforcement provisions of title III of the
Americans With Disabilities Act (ADA), 42 U.S.C. 12188, which
provide persons discriminated against because of disability with
the remedies and procedures set forth in subsection 204(a) of
Title II of the Civil Rights Act of 1964, 42 U.S.C. 2000a-3(a),

01-07153
☐

- 2 -

also require potential ADA plaintiffs to invoke state
administrative remedies prior to bringing a federal action.

STANDARD OF REVIEW

This Court exercises plenary review over a district court's
dismissal of a complaint under Fed. R. Civ. P. 12(b)(6). Kost v.
Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993).

INTEREST OF THE UNITED STATES

The United States has substantial responsibility for



EXHIBIT
B

enforcement of Title III of the Americans with Disabilities Act, 42 U.S.C. 12181, et seq. (ADA). One of the express purposes of the ADA, 42 U.S.C. 12101(b)(3), is to "ensure that the Federal Government plays a central role in enforcing the standards established in [the Act] on behalf of individuals with disabilities." Pursuant to 42 U.S.C. 12186(b)(1) and 42 U.S.C. 12206(c)(3), the Department of Justice has issued regulations and a Technical Assistance Manual interpreting Title III. Neither the regulations nor the Technical Assistance Manual make any mention of the pre-suit state administrative notice requirement that the district court found applicable here. See 28 C.F.R. 36.501(a) (1993); Department of Justice, Title III of the Americans with Disabilities Technical Assistance Manual SS III-8.1000, 8.2000. The absence of any mention of such a requirement in the contemporaneous administrative interpretation of the statute is cogent evidence of the Attorney General's belief that resort to such procedures was not intended by Congress.

01-07154

- 3 -

Section 308(b) of Title III of the ADA provides authority for the Attorney General to enforce the nondiscrimination requirements only where there is a pattern or practice of discrimination or where discrimination raises an issue of general public importance. The private remedy found in section 308(a) is thus an important vehicle for individuals to correct particular instances of disability-based discrimination that do not rise to the level that would allow a suit by the Attorney General.1/ The limitation placed by the district court's decision in this case on the right of an individual to bring a suit in federal court is unwarranted by the plain language of section 308(b) of the ADA and may result in significantly delaying the vindication of federal rights.

STATEMENT OF THE CASE

A. Procedural History

Eleanor Ozga brought suit on May 5, 1995, against Charles F. Hertzog, D.M.D., and Modern Dental Concepts, a professional corporation with which Dr. Hertzog practices, alleging that they discontinued necessary dental treatment because of her disability, in violation of 42 U.S.C. 12182(a). The district court, on October 13, 1995, granted the defendants' motion to

---

1/ There is no federal administrative remedy under Title III of the ADA. Thus, the Attorney General has taken the position that "it is not necessary to file a complaint with the Department [of Justice] prior to exercising [a] private right of action." Department of Justice, Response to Inquiry, 4 Nat'l Disability L. Rep. P 360.

01-07155

- 4 -

dismiss Ozga's ADA complaint, pursuant to Fed. R. Civ. P. 12(b)(6). The court held that it lacked jurisdiction over plaintiff's federal claim based upon her failure to allege that she had exhausted available state administrative remedies.

B. Facts

Appellant Eleanor Ozga has a psychiatric disorder that causes extreme anxiety, fear, and depression (Complaint ☐ 9).2/ In March 1994, Ozga sought dental treatment and prosthodontics from appellee Charles Hertzog, D.M.D., at the offices of Modern Dental Concepts, Inc., in King of Prussia, Pennsylvania, to correct some dental work that had previously been improperly performed by another dentist (id. at ☐☐ 11-12).

Appellees agreed to provide the needed corrective dental services for a total of $5,280.00, which Ozga paid in June 1994 (id. at ☐☐ 14-15). At the time appellees entered into this agreement, they were aware that Ozga was "susceptible to anxiety and agitation concerning her dental condition," and that she had brought a lawsuit against the dentist who had previously

performed the defective work on her teeth (id. at ☐ 16).

Appellees performed portions of the agreed-upon dental work between April and December 1994 (id. at ☐☐ 17-18). In December 1994, however, when Hertzog produced the permanent crowns he proposed to use, Ozga was dissatisfied with their appearance and

---

2/ On appeal from the dismissal of a complaint, this Court "accept[s] all factual allegations in the complaint as true and give[s] the pleader the benefit of all reasonable inferences that can be fairly drawn therefrom." Kost v. Kozakiewicz, 1 F.3d at 183.
01-07156

- 5 -

sought a written certification that the crowns met the specifications of her agreement with appellees (id. at ☐☐ 19-20). When appellees refused to provide such a certification, Ozga commenced a pro se lawsuit in state small claims court (id. at ☐ 21).3 The state court magistrate dismissed her complaint after Hertzog testified under oath that the crowns he had prepared were the ones for which Ozga had contracted and that he would complete the dental treatment for which she had contracted (id. at ☐ 22).

Following the dismissal of the lawsuit, appellants refused to install the crowns or provide further dental services and demanded that Ozga sign a General Release discharging them from any liability to her (id. at ☐ 23 & Exhibit B). Ozga refused to sign such a release, retained counsel, and filed an appeal of the state court's dismissal of her complaint (id. at ☐ 24). After unsuccessful settlement discussions, appellants refused to complete Ozga's dental work on the grounds that she is "crazy," mentally unstable, and might cause "trouble" through litigation or otherwise (id. at ☐☐ 25-26). Ozga then dismissed her appeal of the state court action and brought this suit under the ADA (Complaint ☐ 30).

C. The Decision Below

The district court granted the defendants' motion to dismiss

plaintiff's ADA complaint, pursuant to Fed. R. Civ. □. 12(b)(6),

3/ That suit was based upon appellants' "refusal to certify
that the crowns they had prepared were conformed to their
agreement with Mrs. Ozga" (Complaint □ 21). It did not include
any claim of discrimination based upon her disability.

01-07157

- 6 -

holding that it lacked jurisdiction over Ozga's federal claim
because she failed to allege that she had exhausted available
state administrative remedies. The court found that the ADA
enforcement provision, 42 U.S.C. 12188, incorporates not only the
remedies and procedures of subsection 204(a) of the Civil Rights
Act of 1964 to which it specifically refers, but also subsection
204(c) of the 1964 Act, which the court found requires exhaustion
of available state and local administrative remedies.

Since state law authorizes the Pennsylvania Human Relations
Commission to investigate and resolve allegations of
discrimination on the basis of disability in places of public
accommodation, 49 Pa. Cons. Stat. □□ 955(i)(1), 956, 959, the
court held that Ozga was required to exhaust that remedy before
filing her federal suit.

SUMMARY OF ARGUMENT

The district court dismissed Ozga's complaint of disability-
based refusal to provide dental services because she failed to
allege that she had exhausted state administrative remedies.
That decision is incorrect primarily because the plain language
of the statute does not require it. In providing individuals who
suffer discrimination based on disability by a place of public
accommodation the remedies and procedures provided in subsection
204(a) of the Civil Rights Act of 1964, Congress did not intend
to engraft upon Title III of the ADA other provisions of section
204 that have no applicability to the unique statutory scheme
created by the ADA. The district court's task was to apply the
01-07158

- 7 -

statute as written, not to rewrite it. Department of Defense v.
FLRA, 114 S. Ct. 1006, 1014 (1994).

The effect of the district court's erroneous decision is to
introduce an unwarranted barrier to the prompt vindication of
rights protected by the ADA. Because subsection 204(c) of the
1964 Act gives the district court in which an action is filed
pursuant to 204(a) the authority to "stay proceedings in such
civil action pending the termination of State or local
enforcement proceedings," 42 U.S.C. 2000a-3(c), the district
court's decision could cause a substantial delay. Where it is
apparent from the plain language of the statute that Congress did
not intend to impose such a delay, the district court had no
authority to create one.

ARGUMENT

INDIVIDUALS ALLEGING DISCRIMINATION BASED UPON DISABILITY
IN PLACES OF PUBLIC ACCOMMODATION NEED NOT INVOKE STATE
ADMINISTRATIVE REMEDIES PRIOR TO BRINGING SUIT IN FEDERAL
COURT UNDER TITLE III OF THE AMERICANS WITH DISABILITIES ACT

The Plain Language Of The Statute Does Not Require
Invocation Of State Administrative Remedies Prior To
Bringing Suit in Federal Court

In any inquiry into the meaning of a statute, "[t]he
language of the statute [is] the starting place." Staples v.
United States, 114 S. Ct. 1793, 1797 (1994). The Supreme Court
has instructed "time and again that courts must presume that a
legislature says in a statute what it means and means in a
statute what it says there." Connecticut Nat'l Bank v. Germain,
503 U.S. 249, 253-254 (1992).

01-07159

- 8 -

Title III of the Americans With Disabilities Act (ADA), 42
U.S.C. 12181, et seq., provides that

[n]o individual shall be discriminated against on
the basis of disability in the full and equal enjoyment
of the goods, services, facilities, privileges,

advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. 12182(a). Included within the definition of "public accommodation" is the "professional office of a health care provider." 42 U.S.C. 12181(7)(F).

Congress intended the nondiscrimination provisions of Title III to be enforced both by persons who are themselves subjected to discrimination on the basis of disability, 42 U.S.C. 12188(a), and by the Attorney General, 42 U.S.C. 12188(b). Thus, section 308(a)(1), 42 U.S.C. 12188(a)(1), provides, in relevant part (emphasis added):

> The remedies and procedures set forth in section 204(a) of the Civil Rights Act of 1964 (42 U.S.C. 2000a-3(a)) are the remedies and procedures this title provides to any person who is being subjected to discrimination on the basis of disability in violation of this title or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 303.

The "remedy" provided by section 204(a) of the 1964 Act, 42 U.S.C. 2000a-3(a), is a civil action for injunctive relief. The "procedures" it provides are intervention by the Attorney General in a case certified by the Attorney General to be of "general public importance," and, "upon application by the complainant and in such circumstances as the court may deem just," appointment of

01-07160

- 9 -

an attorney for the complainant and the commencement of suit without the payment of fees, costs, or security.4/

As it often does in enacting a new statute, Congress selectively incorporated portions of existing statutes into the ADA. The ADA Title III enforcement provision under which Ozga brought suit makes reference only to subsection 204(a) of the 1964 Act. It does not refer to any of the other three subsections of section 204. The district court had no basis for ignoring the plain language of section 308 of the ADA and

incorporating into it additional subsections of section 204 to which Congress did not refer.

This Court faced an analogous situation in *Sperling v. Hoffman-La Roche, Inc.*, 24 F.3d 463 (1994). There the issue was whether the filing of a representative complaint under the Age Discrimination in Employment Act, 29 U.S.C. 626(b), tolled the statute of limitations for unnamed employees to become members of

---

4/    Section 204(a), 42 U.S.C. 2000a-3(a), states:

> Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 2000a-2 of this title, a civil action for preventative relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved and, upon timely application, the court may in its discretion, permit the Attorney General to intervene in such civil action if he certifies that the case is of general public importance. Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the civil action without the payment of fees, costs or security.

01-07161

- 10 -

the opt-in class. At the time the action was filed, the ADEA expressly incorporated the statute of limitations contained in Section 6 of the Portal-to-Portal Act, 29 U.S.d. 255, 29 U.S.C. 626(e)(1). The employer argued that the tolling question should be governed by Section 7 of the Portal-to-Portal Act, which was not incorporated specifically into the ADEA. Section 7 would have required employees who wished to opt-in to do so within the Section 6 statute of limitations.

This Court noted that "incorporation of selected provisions into section 7(b) of the ADEA indicates that Congress deliberately left out those provisions not incorporated." 24 F.3d at 470. The Court stated that its decision was "a fairly routine application of the traditional rule of statutory

construction pithily captured in the Latin maxim expressio unius est exclusio alterius." Ibid. That principle applies equally here.

Title III of the ADA is not simply a carbon-copy of Title II of the 1964 Act, although both prohibit discrimination in places of public accommodation. Congress recognized that discrimination based upon disability is manifested in ways that are distinct from discrimination on the basis of race, color, religion or national origin, and must be addressed in a different way. Thus, rather than simply amending Title II of the 1964 Act to add disability as a prohibited basis for discrimination, Congress enacted a comprehensive statute addressing issues such as architectural and communication barriers, 42 U.S.C.

01-07162

- 11 -

12182(b)(2)(iv), and provision of auxiliary aids and services, 42 U.S.C. 12182(b)(2)(iii), that were not relevant to the kinds of discrimination prohibited by the 1964 Act. The ADA concept of public accommodations is also much broader than that of Title II of the 1964 Act. Compare 42 U.S.C. 2000a(b) with 42 U.S.C. 12181(7), 42 U.S.C. 12183 (commercial facilities), 42 U.S.C. 12184 (public transportation services provided by private entities).

Congress borrowed from the 1964 Act the remedial structure contained in section 204(a), but it did not thereby incorporate any of the other provisions of section 204. Congress could simply have described in Title III of the ADA the remedies and procedures it intended to provide to aggrieved persons. If it had done so, there would be no argument that Congress intended to require such persons to exhaust State or local administrative remedies. The fact that Congress used subsection 204(a) of the 1964 Act as a shorthand method to refer to the remedies and procedures it intended to provide should not change that

result.5/

5/ Even if the district court were correct that subsection
204(c) of the 1964 Act is implicitly incorporated into the ADA
along with the specifically-referenced subsection 204(a), the
court erred in holding that subsection 204(c) requires
individuals to "exhaust" state administrative remedies.

Subsection 207(a) of the 1964 Act specifically provides (42
U.S.C. 2000a-6-a)) that

[t]he district courts of the United States shall
have jurisdiction of proceedings instituted pursuant to
this subchapter and shall exercise the same without

01-07163
(continued...)

-12-

The district court's decision provides no legal analysis for
its conclusion that ADA Title III plaintiffs must follow the
procedures of subsection (c) of section 204. The underlying
rationale would seem to be, however, that by incorporating
subsection 204(a), Congress must necessarily have intended to
incorporate the rest of section 204 as well. An examination of
the other subsections of section 204 that are also not
specifically incorporated demonstrates the fallacy of any such
reasoning.

Title III of the ADA does not refer specifically to section
204(d) of the 1964 Act, which applies under Title II of the 1964
Act where the alleged discrimination takes place in a state where
there is no state law prohibiting such discrimination. Under
those circumstances, subsection 204(d) allows a court in which a
civil action is commenced pursuant to section 204(a) to refer the
matter to the Community Relations Service (CRS) for a limited
time, if it believes there is a "reasonable possibility of
obtaining voluntary compliance." Although the district court's
rationale would suggest that subsection 204(d) may be followed by

5/        (...continued)
regard to whether the aggrieved party shall have
exhausted any administrative or other remedies that may
be provided by law.

In reconciling the seeming contradiction between subsection

204(c) and subsection 207(a), courts have concluded that subsection 204(c) requires only that the aggrieved person give notice of the alleged violation to the state or local agency and wait 30 days thereafter before filing suit; exhausting the state or local remedy is not a jurisdictional prerequisite to suit. Harris v. Erickson, 457 F.2d 765, 766 (10th Cir. 1972).

01-07164

-13-

a court in which an ADA Title III action is filed, Congress could not have intended such a result. Since the ADA did not expand the jurisdiction of the CRS to allow it to mediate issues of discrimination based on disability, Congress could not have intended subsection 204(d) to be incorporated by implication into Title III.

Neither does the ADA refer to subsection (b) of section 204 of the 1964 Act, which allows a court to award attorney's fees to a prevailing party other than the United States in an action brought pursuant to subsection 204(a). Congress certainly did not intend to incorporate subsection (b) because the ADA contains a separate attorney's fees provision, 42 U.S.C. 12205, that is applicable to all civil actions and administrative proceedings brought pursuant to the ADA.

As this Court has recognized, a statute " ' is as significant for what it omits as for what it says.'" In re TMI, 67 F.3d 1119, 1123 (1995), quoting Williams v. Wolgemuth, 540 F.2d 163, 169 n.30 (3d Cir. 1976). See also Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 536 (1947) (in construing a statute, "[o]ne must also listen attentively to what it does not say.") The inherent differences between Title II of the 1964 Act and Title III of the ADA demonstrates the error in the district court's attempt to pick and choose, on its own, portions of the 1964 Act to incorporate into the ADA. Rather,

01-07165

-14-

the district court was bound by the plain language of section 308

of the ADA to allow Ozga to proceed with her suit.6/

6/ The only discussion in the legislative history of the ADA of prerequisites to filing a federal action under Title III is contained in a colloquy between Senator Harkin, one of the primary sponsors of the ADA and the floor manager of the bill, and Senator Bumpers, a co-sponsor. Although the colloquy is apparently addressed to the question whether Title III creates any federal administrative remedy, it indicates that it was not accidental that Congress incorporated only subsection (a) of section 204.

 MR. BUMPERS. * * * if somebody who is disabled goes into a place of business, and we will just use this hypothetical example, and they say, "You do not have a ramp out here and I am in a wheelchair and I just went to the restroom here and it is not suitable for wheelchair occupants," are they permitted at that point to bring an action administratively against the owner of that business, or do they have to give the owner some notice prior to pursuing a legal remedy?

 MR. HARKIN. First of all Senator, there would be no administrative remedy in that kind of a situation. The administrative remedies only apply in the employment situation. In the situation you are talking about --

 MR. BUMPERS. That is true. So one does not have to pursue or exhaust his administrative remedies in title III if it is title III that is the public accommodations.

135 Cong. Rec. ☐10759-10760 (Sept. 7, 1989). If Congress had intended to incorporate subsection 204(c) of the 1964 Civil Rights Act into Title III of the ADA, it is likely that either Congressmen Harkin or Bumpers would have made reference to it during this colloquy. The fact that they did not is persuasive evidence against the district court's interpretation of the statute.

01-07166
☐

- 15 -

CONCLUSION

 The judgment of the district court should be reversed.

  Respectfully submitted,

  DEVAL L. PATRICK
   Assistant Attorney General


  JESSICA DUNSAY SILVER
  MARIE K. McELDERRY
   Attorneys
   Department of Justice
   P.O. Box 66078

01-07167

Washington, D.C. 20035-6078
(202) 514-3068

# EXHIBIT C



 *mass.gov home* • *online services* • *state agencies*    SEARCH MASS.GOV

### Massachusetts Architectural Access Board

**FACT SHEETS
INFORMATION
ABOUT THE AAB**

1. **NEWS**

2. What is the AAB?
3. Complaint Process
4. Variance Process
5. Hearing Process
6. Advisory opinion

**COMPLAINT FORMS**

- Building
- Housing
- Parking
- Sidewalk/Curb Cut
- Telephone

**MISCELLANEOUS**

- AAB Regulations
- Variance Form
- Hearing Schedule
- Design Awards
- Other Related Links



*What is the
Architectural
Access Board?*

*For news and updates from the AAB, visit our* News *section*

***Please note AAB Rules and Regulations posted on this website are now the most recent edition of 521 CMR.***

The Architectural Access Board (AAB) is a regulatory agency within the Massachusetts Executive Office of Public Safety. Its legislative mandate states that it shall develop and enforce regulations designed to make public buildings accessible to, functional for, and safe for use by persons with disabilities.

To carry out the board's mandate, the "Rules and Regulations", which appear in the code of Massachusetts Regulations as 521 CMR 1.00, have been developed and amended. These regulations are incorporated in the Massachusetts building code as a "specialized code", making them enforceable by all local and state building inspectors, as well as by the Board itself.

These regulations are designed to provide full and free use of buildings and facilities so that persons with disabilities may have the education, employment, living and recreational opportunities necessary to be as self-sufficient as possible and to assume full responsibilities as citizens.

The Board consists of nine members: the Secretary of Public Safety or her designee; the Secretary of Elder Affairs or his designee; the Director of the Office on Disability or his designee; and six members appointed by the Governor in consultation with the Secretary of Public Safety from lists submitted by the director of the Office on Disability. Three of the appointed members are selected after consultation with advocacy groups in behalf of persons with disabilities. The governor, secretary and director shall exercise their best efforts to ensure at least two members are registered architects. The chairperson shall be elected annually by the members.

The authority of the AAB is triggered by any construction, renovation, remodeling, or alteration of a public building or facility,

or a change in use of building from private to public.

Public buildings are buildings constructed by the Commonwealth or any political subdivision thereof with public funds and open to public use, as well as privately financed buildings that are open to and used by the public.

The nine member Board meets every other Monday to hear requests for variances by building owners and others responsible for complying with the regulations and to hear complaints about buildings that are believed to be in violation of the AAB regulations. In order for the Board to grant a variance, compliance must be proven to be impracticable. Impracticability is defined as being either "technologically infeasible" or the "cost of compliance is excessive without any substantial benefit to persons with disability."

All hearings on complaints and variance requests are conducted in accordance with the Massachusetts Administrative Procedures Act, Chapter 30A, and are open to the public.

The Board also has the authority, after a further hearing, to impose fines of up to $1,000 per violation for each day of noncompliance that the Board finds was without justification.

### Current members of the Board are:

- Gerald LeBlanc, Acting Chairperson
- 
- Cleary O. Buckley, Member
- Myra Berloff, Office on Disability designee
- Edward Kelly, Secretary of Public Safety designee
- Paul J. Moriarty, Secretary of Elder Affairs Designee
- 

### The AAB staff members are:

- Thomas P. Hopkins, Director
- Kate Bernier, Administrative Coordinator.
- Mark Dempsey, Compliance Officer

If you have any questions about particular process, please send an e-mail to the appropriate AAB staff member by clicking one of the underlined names above.

AAB staff is prepared to assist in the filing of complaints, as well as in providing assistance in presentations before the Board. The office is open Monday through Friday from 8:45 a.m. to 5:00 p.m.

521 CMR:  ARCHITECTURAL ACCESS BOARD

**JURISDICTION**

**3.1    SCOPE**

All work performed on *public buildings or facilities* (**see definition**), including *construction, reconstruction, alterations, remodeling, additions*, and *changes of use* shall conform to 521 CMR.

3.1.1  To determine the scope of compliance, refer to **521 CMR 3.2, New** *Construction* and **521 CMR 3.3, Existing** *Buildings*.  In the absence of jurisdiction by 521 CMR, 780 CMR: the State Building Code may apply.

**3.2    NEW CONSTRUCTION**

All new *construction* of *public buildings* shall comply fully with 521 CMR.

**3.3    EXISTING BUILDINGS**

All *additions* to, *reconstruction, remodeling*, and *alterations* or *repairs* of existing *public buildings or facilities*, which require a *building* permit or which are so defined by a state or local inspector, shall be governed by all applicable subsections in **521 CMR 3, JURISDICTION**.

For specific applicability of 521 CMR to existing *multiple dwellings* undergoing *renovations*, see **521 CMR 9.2.1**.

3.3.1  If the work being performed amounts to less than 30% of the *full and fair cash value* of the *building* and

    a.    if the work costs less than $100,000, then only the work being performed is required to comply with 521 CMR

or

    b.    if the work costs $100,000 or more, then the work being performed is required to comply with 521 CMR.  In addition, an *accessible* public *entrance* and an *accessible* toilet room, telephone, drinking fountain (if toilets, telephones and drinking fountains are provided) shall also be provided in compliance with 521 CMR.

    Exception:  General maintenance and on-going upkeep of existing, underground transit *facilities* will not trigger the requirement for an *accessible entrance* and toilet unless the cost of the work exceeds $500,000 or unless work is being performed on the *entrance* or toilet.

    Exception:  Whether performed alone or in combination with each other, the following types of *alterations* are not subject to **521 CMR 3.3.1**. (When performing exempted work, a memo stating the exempted work and its costs must be filed with the permit application or a separate *building* permit must be obtained.)

        a.    Curb Cuts:  The *construction* of *curb cuts* shall comply with **521 CMR 21.**
        b.    *Alteration* work which is limited solely to electrical mechanical, or plumbing systems; to abatement of hazardous materials; to retrofit of automatic sprinklers **and** does not involve the *alteration* of any *elements* or *spaces* required to be *accessible* under 521 CMR. Where electrical outlets and controls are altered, they must comply with 521 CMR.
        c.    Roof *repair* or replacement, window *repair* or replacement, repointing and masonry *repair* work.
        d.    Work relating to septic system *repairs*, (including Title V, 310 CMR 15.00, improvements) site utilities and landscaping.

3.3.2  If the work performed amounts to 30% or more of the *full and fair cash value* of the *building* the entire *building* is required to comply with 521 CMR.

    a.    Where the cost of constructing an *addition* to a *building* amounts to 30% or more of the *full and fair cash value* of the existing *building*, both the *addition* and the existing *building* must

521 CMR:  ARCHITECTURAL ACCESS BOARD

**JURISDICTION**

be fully *accessible*.

3.3.3 Tenant vs. owner of *building*: *Alterations* by a tenant do not trigger the requirements of **521 CMR 3.3.1.b. and 3.3.2** for other tenants. However, *alterations, reconstruction, remodeling, repairs, construction*, and *changes in use* falling within **521 CMR 3.3.1b** and **3.3.2**, will trigger compliance with **521 CMR** in areas of *public use* for the owner of the *building*.

3.3.4 No *alteration* shall be undertaken which decreases or has the effect of decreasing accessibility or usability of a *building* or *facility* below the requirements for new *construction*.

3.3.5 If *alterations* of single *elements*, when considered together, amount to an *alteration* of a room or *space* in a *building* or *facility*, that *space* shall be made *accessible*.

3.3.6 No *alteration* of an existing *element*, space, or area of a *building* or *facility* shall impose a requirement for greater accessibility than that which would be required for new *construction*.

**3.4    CHANGE IN USE**

When the use of a *building* changes from a private use to one that is open to and used by the public, an *accessible entrance* must be provided, even if no work is being performed. When a portion of a *building* changes use from a private use to one that is open to and used by the public, then an *accessible route* must be provided from an *accessible entrance* even if no work is being performed.

3.4.1 RESERVED FOR FUTURE ACTION:    *Changes in use*, from private to public, in private residential homes where no work is being performed.

**3.5    WORK PERFORMED OVER TIME**

When the work performed on a *building* is divided into separate phases or *projects* or is under separate *building* permits, the total cost of such work in any 36 month period shall be added together in applying **521 CMR 3.3, Existing Buildings**.

**3.6    MULTIPLE USES**

When a *building* is occupied by two or more uses, the Regulations which apply to each use shall apply to such parts of the *building* within that *use*.

3.6.1 **521 CMR 3.3, Existing Buildings** shall apply based upon each *use* and not on the entire *building*.

Example: If a three story *building* valued at $300,000 has one floor of retail *use* and two floors of residential *use*, the *full and fair cash value* of the retail portion shall be _ of the total value which would be $100,000.

**3.7    PARTIAL APPLICATION**

When only a portion of a *building* is subject to 521 CMR, the *full and fair cash value* shall be prorated by the ratio of the square footage of that portion to the square footage of the whole *building*.

Example: Where the whole *building* is 100,000 square feet, the *full and fair cash value* is $1,000,000, and the part subject to 521 CMR is 10,000 square feet (one-tenth of the total), then the *full and fair cash value* of the part subject to 521 CMR would be one-tenth of $1,000,000 or $100,000.

3.7.1 If the *Board* determines that such proration would cause an inequitable result, the *Board* may otherwise calculate the *full and fair cash value* of the portion of the *building*.

**3.8    OUTDOOR FACILITIES**

For *facilities* where the *primary function areas* are outdoors, including but not limited to beaches, parks, picnic areas, playgrounds, and campsites, the *full and fair cash value* shall include the value of the land as well as any *buildings* or *facilities* on the land.

**3.9    HISTORIC BUILDINGS**

An historic *building* or *facility* that is listed or is eligible for listing in the National or State Register of Historic Places or is designated as historic under appropriate state or local laws may be granted a *variance* by the *Board* to allow alternate accessibility.  If a variance is requested on the basis of historical significance, then consultation with the Massachusetts Historical Commission is required in order to determine whether a *building* or *facility* is eligible for listing or listed in the National or State Register of Historic Places.  The Massachusetts Historical Commission may request a copy of the proposed variance request and supporting documentation to substantiate the variance request and its effect on historic resources.  A written statement from the Massachusetts Historical Commission is required with the application for variance.

**3.10  TEMPORARY STRUCTURES**

Temporary *buildings* or *facilities*, including but not limited to reviewing stands, temporary classrooms, bleacher areas, exhibit areas, temporary banking *facilities*, temporary health screening services, or temporary pedestrian passageways around a *construction site*, shall comply with 521 CMR.  Structures, *sites* and equipment directly associated with the actual processes of *construction*, such as scaffolding, bridging, materials hoists, or *construction* trailers, need not apply.

**3.11  SECURITY STRUCTURES**

Accessibility is not required to observation galleries used primarily for security purposes.

**3.12  NON-OCCUPIABLE SPACES**

Spaces accessed only by ladders, catwalks, crawl spaces, or freight (non-passenger) elevators, and frequented only by service personnel for *repair* purposes, are exempt.  Such spaces may include, but are not limited to, elevator pits, elevator penthouses, piping or equipment catwalks.